**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

ASHLEY Y. HENNY,

                             **Plaintiff,**

           **-against-**

**COMMISSIONER OF SOCIAL SECURITY,**

                           **Defendant.**
----------------------------------------------------------------X

**16-CV-2551 (GHW)(SN)**

**REPORT AND**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GREGORY H. WOODS:**

     Ashley Y. Henny seeks judicial review, under 42 U.S.C. § 405(g), of the Commissioner

of Social Security's denial of her application for Supplemental Security Income ("SSI") benefits.

The Commissioner of Social Security moves for judgment on the pleadings under Federal Rule

of Civil Procedure 12(c).

     Henny protectively filed for SSI benefits on December 14, 2012, alleging that she was

disabled as of the date of filing due to a number of mental disorders (bipolar disorder, obsessive

compulsive disorder, anxiety, depression, and mood disorders), asthma, and a back problem.[1] A

hearing was conducted before Administrative Law Judge ("ALJ") Robert Gonzalez on June 3,

2014. On August 5, 2014, the ALJ denied Henny's claim for SSI benefits, finding that although

she did have severe impairments, she maintained a residual functional capacity to perform light

work as defined in 20 C.F.R. § 416.967(b), with a limitation to understanding and carrying out

---

[1] While Henny stated in her initial application that she was disabled as of January 1, 1995, she had
previously filed an application on September 9, 2010, which was denied at the ALJ level on February 16,
2012. (Tr. 15.) Accordingly, the ALJ decided that administrative res judicata applied prior to the period
prior to February 17, 2012. See 20 C.F.R. § 416.4155 (noting that ALJ decision is binding if no appeal is
taken to the Appeals Council in a timely fashion).

simple, routine repetitive tasks commensurate with unskilled work, without concentrated exposure to smoke, dust, and noxious fumes. In reaching this conclusion, the ALJ declined to give controlling weight to the opinion of Dr. Evelyn Wasserman, Henny's treating psychiatrist, because in the ALJ's view, her conclusions were contradicted by treatment records, and accorded "great" weight to the opinion of Dr. T. Bruni, a consulting psychiatrist. The ALJ found that Henny could not perform any of her past relevant work, but, applying the Medical-Vocational Rules, found that jobs existed in significant numbers in the national economy that Henny could perform. On February 4, 2016, the Social Security Appeals Council affirmed the ALJ's decision without opinion, thus rendering it the final decision of the Commissioner.

For the reasons set forth below, the Court recommends that the Commissioner's motion (ECF No. 24) be DENIED, and the case remanded to the Commissioner for further proceedings.

## BACKGROUND

### I.      Evidence in the Administrative Record

### A.      Plaintiff's Statements to the Social Security Administration

On February 11, 2013, Henny completed a functional questionnaire in response to the agency's request. She noted that she was taking care of a twenty-two-month old child with the assistance of family members. (Tr. 197.) She had no problems with personal care, but needed reminders to take her medication. (Tr. 197–98.) She cooked several meals a day for herself and for her daughter, but needed assistance from her aunt for certain household chores and yardwork. (Tr. 199.) She noted that she "hardly" went out because she felt awkward, and being around people would produce anxiety and panic attacks, but sometimes went out for medical appointments, her daughter's play dates, or errands such as grocery shopping. (Tr. 199–200.)

Henny noted that she suffered from back problems, and experienced pain when standing, lifting, stair climbing, and walking, but did not take any pain medications. (Tr. 201–02, 204–06.) She had problems paying attention and finishing activities that she started and noted difficulties following oral, though not written, instructions. (Tr. 203.) She had problems with individuals in authority positions and had lost jobs several times in the past years. (Tr. 203.) She had problems remembering things, noting that she would get upset, "black out," and then forget why she was upset several minutes later. (Tr. 204.)

Henny also stated that she had ongoing problems with panic attacks, which would come on when she would become frustrated in attempting to explain something to others. (Tr. 208.) These attacks were characterized by anxiety, anger, shortness of breath, burning face, stuttering, and would occur on a daily basis. (Tr. 208.) She noted that Dr. Wasserman had prescribed her the medication Abilify for this condition. (Tr. 208.)

### B. Medical History

#### i. Dr. Evelyn Wasserman

In March 2011, Henny sought treatment at the Rockland County ACT and was evaluated by psychiatrist Dr. Evelyn Wasserman. In her initial evaluation, Dr. Wasserman found that she had a history of not taking her medications, had previously been admitted to several psychiatric facilities, and suffered from a mood disorder (NOS or not otherwise specified), but was not psychotic or suicidal. (Tr. 403–05.)

In April 2012, Dr. Wasserman conducted a second evaluation of Henny. She noted that Henny took her medication inconsistently, and diagnosed her with a mood disorder (NOS) and attention deficit hyperactivity disorder ("ADHD"). (Tr. 402.) She further noted that Henny was actively looking for work.

On October 4, 2012, Dr. Wasserman completed a psychiatric disability report for a state vocational rehabilitation program, where she continued to diagnose her with mood disorder and ADHD, noting that she was not psychotic, had good memory, and superficial insight. (Tr. 270.) She noted that she can become easily frustrated, but rated her work ability as good to fair. (Tr. 271.) Dr. Wasserman reached similar conclusions in an October 18, 2012 re-evaluation. (Tr. 401.) Further progress notes from December 2012 to February 2013 indicate that Henny continued to have issues taking her medication, but recognized that she was better when on it. (Tr. 419–23.)

On February 21, 2013, Dr. Wasserman filled out another form for the New York Office of Temporary and Disability Assistance. Her diagnosis continued to be a mood disorder NOS and attention deficit disorder; bipolar disorder was to be ruled out. (Tr. 274.) Dr. Wasserman noted that Henny had poor judgment and limited insight, became easily frustrated by criticism in work environments, needed supervision, structure, and limits, and could not multi-task. (Tr. 278.) On April 15, 2013, Dr. Wasserman changed her diagnosis to bipolar unspecified type and ADD, and assessed her a global assessment of functioning ("GAF") score of 50. (Tr. 400.) Henny noted that she would continue to attempt to pursue work or school and work on taking her medication more regularly. (Tr. 400.)

On June 3, 2013, at Henny's request, Dr. Wasserman provided a summary of her psychiatric history to Binder & Binder, the firm representing her in the underlying administrative proceedings. Dr. Wasserman noted that Henny had ADD, mood disorder NOS, and was likely bipolar. (Tr. 315.) She noted that Henny was unable to keep a job for more than several weeks at a time, and did not believe that she could "hold a job successfully for the next year, during which time she will continue to be involved with our services." (Tr. 316.)

On October 7, 2013, Dr. Wasserman completed a psychiatric/psychological impairment questionnaire, which she also provided to Binder & Binder. She diagnosed Henny with "mood disorder/bipolar" and ADD. (Tr. 407.) In a checklist, Dr. Wasserman noted that Henny suffered from poor memory, appetite disturbance with weight change, mood disturbance, recurrent panic attacks, paranoia or inappropriate suspiciousness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, intrusive recollections of traumatic experiences, and generalized persistent anxiety. (Tr. 408.) Dr. Wasserman noted that Henny's primary symptoms were mood lability, instability, and non-compliance with medication. (Tr. 409.) She assessed that Henny had moderate limitations (defined on the questionnaire as "significantly affect but does not totally preclude the individual's ability to perform the activity") on a battery of work-related functions involving memory, understanding, concentration, and adaptation. (Tr. 409–12.) Dr. Wasserman noted that the impairment was ongoing and likely to last for over 12 months, that Henny experiences episodes of deterioration or decompensation at work that cause her to withdraw from that situation or exacerbate her symptoms, and was likely to be absent from work more than three times a month. (Tr. 412–13.) Therefore, Dr. Wasserman concluded that she was incapable of even "low stress" employment "at this time." (Tr. 413.)

In a December 9, 2013 progress note, Dr. Wasserman noted continued non-compliance with medication, and also that plaintiff stated that she was babysitting several children overnight three to four times a week. (Tr. 428.) Progress notes in January, February, and March 2014 were consistent with prior notes, and noted continued difficulties with medication compliance. (Tr. 476–78.)

###### ii.   Dr. William Lathan

Dr. William Lathan, a consultative internal medicine physician with whom Henny has no doctor-patient relationship, examined Henny on March 11, 2013. Dr. Lathan noted a history of bronchial asthma and back pain, and made a diagnosis consistent with this history. (Tr. 304, 306.) His musculoskeletal exam concluded that Henny had limited bilateral lumbar flexion, extension and rotational movement. (Tr. 305–06.) Dr. Lathan opined that Henny had a moderate restriction for bending and strenuous exertion due to her back condition, and should avoid smoke, dust, and noxious fumes due to her asthma. (Tr. 306.)

###### iii.   Dr. T. Bruni

State agency psychological consultant Dr. T. Bruni reviewed the medical information in the record as of March 21, 2013.[2]  Dr. Bruni found that Henny's affective disorder, ADHD, and asthma all qualified as "severe." (Tr. 66.) She found that these disorders created moderate restrictions in maintaining concentration, persistence, or pace and mild restrictions in daily activities and maintaining social functioning. (Tr. 66.) She further found that Henny had no episodes of decompensation of extended duration. (Tr. 66.) Similar to Dr. Lathan's findings, Dr. Bruni concluded that Henny should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation on account of her asthma, as well as exposure to extreme heat and cold. (Tr. 68.)

In assessing Henny's mental residual functional capacity, Dr. Bruni did find that Henny had limitations in understanding, memory, concentration and persistence, socializing, and adaptation. (Tr. 69–70.) She found moderate limitations in the ability to remember locations and

---

[2] Therefore, Dr. Bruni did not have the opportunity to examine treating psychiatrist Dr. Wasserman's detailed October 7, 2013 psychiatric/psychological impairment questionnaire, upon which Henny heavily relied at her hearing.

work-like procedures, the ability to understand, remember, and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday/workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to adapt to changes in the workplace, and the ability to set realistic goals or make plans independently of others. (Tr. 69–70.) She found, however, that Henny was not limited in understanding, remembering, or carrying out very short and simple instructions, performing activities within a schedule, working in coordination with others, and making simple work-related decisions, among other functions. (Tr. 69–70.) Accordingly, Dr. Bruni concluded that Henny was not disabled, but limited to unskilled work. (Tr. 72–73.)

## C.    The ALJ Hearing

At the June 5, 2014 hearing before ALJ Robert Gonzalez, Henny appeared with counsel, who verified that no documents were outstanding in the case and that the record was complete. (Tr. 30.) Henny testified that she was taking her Abilify medication twice a day, with reminders from her paternal grandmother. (Tr. 37.) She noted that she was doing "much better" physically, but still had a back problem that pained her after excessive standing, walking, or sitting. (Tr. 39, 42.) She also noted that she was seeking admission into a school program. (Tr. 39–40.)

Henny testified that her previous attempts to maintain employment at businesses such as Dunkin Donuts and Dollar Tree were unsuccessful because of conflicts with management. (Tr. 44–45, 51–52, 56–57.) She reported panic attacks and breakdowns both at work and in other public environments, such as in the mall when her child was difficult to control. (Tr. 45, 48.) She reported, however, that with the assistance of friends and neighbors, she was able to take care of her daughter and all of her responsibilities of daily living. (Tr. 49–50.) Henny also testified that

she earned some money by babysitting children, though the exact scope of her babysitting activities were not entirely clear from the record, as Henny testified she only babysat her nieces during the day (Tr. 33), while the ALJ pointed out that her treatment notes from ACT suggested that she also periodically babysat other children overnight. (Tr. 52–53.) The ALJ also explored her alleged statement to Dr. Wasserman that she was seeking off-the-books employment so as to not endanger her SSI application. (Tr. 53–55.)

## II.    The ALJ Decision

In an August 5, 2014 decision, ALJ Gonzalez found that Henny had four severe impairments as defined in 20 C.F.R. § 416.920(c); attention deficit disorder, bipolar disorder, asthma, and a back syndrome. (Tr. 15.) The ALJ noted that these impairments result in both exertional and non-exertional limitations, and therefore have more than a minimal effect upon her work ability. (Tr. 16.) Nevertheless, the ALJ also determined that Henny did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, and therefore proceeded to consider her residual functional capacity. The ALJ found that Henny retained a "residual functional capacity to perform light work . . . except that she is limited to understanding and carrying out simple, routine repetitive work commensurate with unskilled work, without concentrated exposure to smoke, dust, and noxious fumes." (Tr. 17.) He noted that she was unable to perform past relevant work, as defined in 20 C.F.R. § 416.965, as a fast food restaurant worker because it required concentrated exposure to fumes. (Tr. 21.) Applying the Medical-Vocational Guidelines in 20 C.F.R. Part 404, Subpart P, Appendix 2, and Henny's age, education, work experience, the ALJ found that there are jobs that exist in significant numbers in

the national economy that the claimant can perform. (Tr. 22.) Accordingly, he found that Henny

was not disabled. (Tr. 22.)

In reaching this conclusion, the ALJ found that though Henny testified to emotional

problems, panic attacks and feelings of paranoia, she did not describe limitations of activities of

daily living that would be expected from such debilitating conditions and noted specifically that

she took care of her child and other children, went to the mall and church activities, and play

dates with her daughter. (Tr. 18.) The ALJ further noted that the allegations of panic attacks and

paranoia were unsupported by Dr. Wasserman's records. (Tr. 18, n.1.) He also noted that there

was no indication that Henny was receiving regular medical treatment for her back condition or

that she had any other acute medical issues with the exception of asthma. (Tr. 19.) The ALJ

placed great weight on Dr. Lathan's medical report finding moderate restrictions on bending and

strenuous exertion, and that she should avoid smoke, dust, and noxious fumes. (Tr. 19.)

The ALJ, however, declined to give controlling weight to the opinions expressed in the

October 17, 2013 questionnaire filled out by Dr. Wasserman, Henny's treating psychiatrist,

which noted moderate limitations in a wide variety of work-related and social functions. Such

limitations included even remembering one or two step instructions or making simple work

decisions, as well as alleged episodes of decompensation and/or deterioration in work-like

settings, and bouts of panic attacks and paranoia. (Tr. 20.) This questionnaire also concluded

that, for the time being, Dr. Wasserman believed Henny to be incapable of even low stress work.

(Tr. 20.) The ALJ noted that Dr. Wasserman's opinion had significant probative value because it

came from a treating psychiatrist, but was nonetheless contradicted by her treatment records. (Tr.

20.) The ALJ stated that there was no mention of paranoia or inappropriate suspiciousness in Dr.

Wasserman's progress notes, and that "there is no evidence of psychosis, which is inconsistent

with a finding of paranoia/inappropriate suspiciousness." (Tr. 20.) Finally, the ALJ did not give weight to Dr. Wasserman's opinion that Henny could not keep a job, because "claimant had repeatedly stated that she wanted to work off the books and not endanger her Social Security benefits." (Tr. 20.) The ALJ did, however, accord great weight to Dr. Bruni's assessment that Henny would have moderate limitations in concentration, persistence and pace, and found this to be well supported by Dr. Wasserman's treatment reports. (Tr. 21.)

The ALJ further expressed concerns with Henny's candor and credibility, finding that she was slow to admit in the hearing that she was babysitting for pay and referencing her past statements to Dr. Wasserman that she did not want to work on the books at the time because she did not want to endanger her eligibility for SSI benefits. (Tr. 21.)

On February 4, 2016, the Social Security Appeals Council affirmed the ALJ's decision without opinion, thus rendering it the final decision of the Commissioner. (Tr. 1.)

## ANALYSIS

### I.    Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The ALJ's disability determination may be set aside if it is not supported by substantial evidence. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362

F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "[O]nce an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault v. Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and emphasis omitted).

When, as here, the Court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is a sufficient basis for granting the motion. See Wellington v. Astrue, 12-CV-3523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); Martell v. Astrue, 09-CV-1701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) (same); cf. Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

Pro se litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); see also Alvarez v. Barnhart, 03-CV-8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal pro se standard in reviewing denial of disability benefits).

## II.     Definition of Disability

A claimant is disabled under the Social Security Act if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(2)(D). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(2)(B).

The Social Security Administration has established a five-step sequential evaluation process for making disability determinations. See 20 C.F.R. § 416.920(a)(4). The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 [(the "Listings")] . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform his past work, the burden then shifts

> to the Commissioner to determine whether there is other work which
> the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that he or she cannot return to prior work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given his or her residual functional capacity, age, education and past relevant work experience. 20 C.F.R. 404.1560(c)(2); Melville, 198 F.3d at 51.

As relevant to this case, 20 C.F.R. § 416.920a provides additional information to guide evaluations of mental impairments. Calling it a "complex and highly individualized process," the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § 416.920a(c)(1),(2). The main areas that are assessed are activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation; each is rated on a five-point scale.  20 C.F.R. § 416.920a(c)(3)–(4). If an impairment is given the rating of "severe," then the ALJ is instructed to determine whether the impairment qualifies as a listed mental disorder.  20 C.F.R. § 416.920a(d)(2).

## III.   Analysis

### A.   ALJ's "Step Three" Analysis is Supported by Substantial Evidence

As the ALJ found for the claimant in steps one and two of the Social Security Administration's sequential five-step process, the Court reviews whether his decision that Henny's admittedly severe mental impairments of attention deficit disorder and bipolar disorder did not meet or medically equal the criteria of a listed impairment was supported by substantial evidence.

An affective disorder will qualify as equivalent to a "listed impairment" if there is medically documented persistence, either continuous or intermittent, of depressive syndrome resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[3] 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 §§ 12.04(A), 12.04(B) (so-called "paragraph B criteria"). If the mental disorder does not qualify as a listed impairment under these standards, it will still qualify as a disability if there is:

> a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: [r]epeated episodes of decompensation, each of extended duration; or a [r]esidual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(C) (so-called "paragraph C criteria").

Considering the paragraph B criteria, the ALJ found that Henny has mild restrictions in daily living and social functioning, moderate difficulties with regard to concentration, persistence, and pace, and no periods of decompensation of extended duration. (Tr. 17.) The ALJ further found that the paragraph C criteria were not met. (Tr. 17.)

---

[3] "The term repeated episodes of decompensation, each of extended duration in the[] listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." If the claimant has experienced "more frequent episodes of shorter duration or less frequent episodes of longer duration, [the Commissioner] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 at § 12.00(C)(4).

In the most recent and detailed questionnaire submitted by Dr. Wasserman, Henny's treating physician, no "marked" restrictions are noted. (Tr. 410–12.) Nor is there anything in Dr. Wasserman's prior treatment notes that would suggest anything more severe than moderate limitations in any relevant area. While both Henny and Dr. Wasserman's questionnaire referenced recurrent panic attacks, neither Henny's statements at the ALJ hearing nor Dr. Wasserman's questionnaire describe episodes of decompensation lasting at least two weeks, or more frequent episodes of shorter duration of equivalent severity. Therefore, the ALJ's decision to proceed to Step 4 of the sequential evaluation was supported by substantial evidence.

### B.   ALJ's Calculation of Residual Functional Capacity and Weighing of Expert Opinions was Supported by Substantial Evidence

#### i.   Mental Conditions

When calculating Henny's residual functional capacity ("RFC"), the ALJ found that she "retained the ability to perform light work as defined in 20 C.F.R. § 416.967(b) except that she is limited to understanding and carrying out simple, routine repetitive work commensurate with unskilled work, without concentrated exposure to smoke, dust and noxious fumes." (Tr. 17.) In reaching this conclusion, the ALJ declined to give controlling weight to treating physician Dr. Wasserman's opinion that Henny would be unable to perform even low-stress work because of panic attacks, paranoia, and social withdrawal leading to decompensation in work-like environments. (Tr. 20.)

The Social Security regulations require the ALJ to give controlling weight to the opinions of "treating sources" when those opinions are well-supported by medical evidence and "not inconsistent with the other substantial evidence." 20 C.F.R. § 416.927(c)(2). Treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of impairments "and may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ." Id. Even if the treating physician's opinion is contradicted by other substantial evidence, it should be entitled to "some extra weight" because "the treating source is inherently more familiar with a claimant's medical condition than are other sources." Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988). But "the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

When the ALJ discredits the opinion of a treating physician, he must follow a structured evaluative procedure and explain his decision. See Rolon v. Comm'r of Soc. Sec'y, 994 F. Supp. 2d 496, 506 (S.D.N.Y 2014). The ALJ must consider: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) the consistency of the treating physician's opinion with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 416.927(c); Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (holding that "to override the opinion of a treating physician . . . the ALJ must explicitly consider" these factors); but see Halloran v. Barnhart, 362 F.3d 28, 32–33 (2d Cir. 2004) (affirming ALJ decision that did not explicitly reference factors but "applied the substance of the treating physician rule").

In this case, the ALJ considered Dr. Wasserman's questionnaire and found that her conclusions that Henny suffered from recurrent panic attacks, paranoia and inappropriate suspiciousness (Tr. 408) were not supported by the prior progress notes. Dr. Wasserman's prior notes referenced mood, attention deficit, and bipolar disorders (Tr. 270–71, 274, 278, 315, 400–01), but did not reference panic attacks or paranoia. Though Dr. Wasserman had concluded in

June 2013 that Henny was not likely to "hold a job successfully for the next year, during which

time she will continue to be involved with our services" (Tr. 316), the ALJ found that this

conclusion was undermined by prior treatment notes indicating that Henny managed childcare

properly and was working as a babysitter, and that she was attempting to pursue work or school.

(Tr. 400, 402.) Furthermore, Dr. Wasserman's statement that Henny experienced episodes of

deterioration or decompensation in work-like settings that caused her to withdraw from that

situation and/or experience exacerbation of signs and symptoms was not supported by prior

treatment notes. [4] (Tr. 412.)

Moreover, Dr. Wasserman's questionnaire, which references "moderate limitations" in

most categories and "mild limitations" in several, such as the ability to carry out simple one or

two-step instructions, is inconsistent with her overall conclusion that Henny is unable to perform

even "low-stress" work. (Tr. 410–13.) On the contrary, the questionnaire is largely consistent

with the report of consultative physician Dr. Bruni, who similarly found moderate restrictions in

concentration, persistence, or pace, including carrying out detailed instructions, and mild

restrictions in daily activities and social functioning. (Tr. 66, 69–70.)

One of the ALJ's conclusions, that "Dr. Wasserman repeatedly said that there is no

evidence of psychosis, which is inconsistent with a finding of paranoia/inappropriate

suspiciousness," is an impermissible attempt to substitute the ALJ's own judgment for that of a

medical expert. (Tr. 20.) Nevertheless, the Court finds that this error is harmless, because the

lack of treatment notes substantiating the clinical diagnosis of paranoia/inappropriate

---

[4] Henny did testify at the ALJ hearing that she had panic attacks relating to controlling her child (Tr. 45)
or interactions with people who were "looking [and] staring at me" (Tr. 48), but also noted that they are
"not that serious." (Tr. 48.)

suspiciousness was sufficient for the ALJ to refuse to afford controlling weight to this section of Dr. Wasserman's opinion.

Though the ALJ did not specifically enumerate and consider each of the factors in 20 C.F.R. § 416.927(c) in determining the proper weight of Dr. Wasserman's opinion, he did balance the nature and extent of the treatment relationship and Dr. Wasserman's specialization with the underlying evidence and consistency of the her opinion with the record as a whole. Therefore, the Court finds that the ALJ's decision to give considerable but not controlling weight to Dr. Wasserman's opinion—and calculate Henny's RFC accordingly—was supported by substantial evidence.

### ii.    Physical Symptoms

In regards to Henny's physical symptoms, the ALJ accorded "great weight" to Dr. Lathan's consultative opinion, which diagnosed Henny with back issues leading to a "moderate restriction for bending and for strenuous exertion," as well as a history of asthma requiring her to avoid "smoke, dust, and noxious fumes." (Tr. 306.) This is largely consistent with Henny's testimony at the ALJ hearing itself. (Tr. 42.)

It does not appear, however, that the ALJ considered Dr. Lathan's diagnosis of a moderate nonexertional bending restriction in calculating Henny's RFC, and there is no substantial evidence in the record that could lead the ALJ to ignore or reject this restriction. Specifically, the ALJ did not consider whether these restrictions limited Henny's ability to carry out the full range of light work as defined in 20 C.F.R. § 416.967(b), which requires lifting of no more than 20 pounds and frequent lifting or carrying of objects weighing up to 10 pounds. Accordingly, on remand, the ALJ should incorporate Dr. Lathan's findings regarding the restrictions on bending and strenuous exertion in the proper calculation of Henny's RFC.

**C.    The ALJ Erred by Relying on the Medical Vocational Rules Given Henny's Non-Exertional Limitations**

At Step 4, the ALJ concluded that Henny's RFC precluded her from any past relevant work as a fast food worker because such work required concentrated exposure to fumes. (Tr. 21.) Accordingly, he proceeded to Step 5 of the sequential evaluation process. At this step, the Commissioner must demonstrate that other work exists in significant numbers in the national economy that the claimant can do, given her RFC, age, education, and work experience. 20 C.F.R. § 416.912(g); 416.960(c).

In meeting her burden under the fifth step, the Commissioner may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly referred to as "the Grid." The Grid takes into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work that exists in the national economy. Generally, the result listed in the Grid is dispositive on the issue of disability.

The Grid, however, focuses on exertional restrictions. Therefore, if a claimant has non-exertional limitations that "significantly limit the range of work permitted by his exertional limitations," the ALJ is required to consult with a vocational expert rather than relying on the Grid. Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir.1986) (internal quotation marks omitted) (quoting Blacknall v. Heckler, 721 F.2d 1179, 1181 (9th Cir.1983)). Though the "mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines," any such limitation that causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity" requires the Commissioner to utilize a vocational expert to

meet her burden at Step 5. Zabala v. Astrue, 595 F.3d 402, 410–11 (2d Cir. 2010) (citations omitted).

In this case, the ALJ found that "the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of 'not disabled' is therefore appropriate under the framework of this rule." (Tr. 22.) No further explanation was offered as to why Henny's moderate mental limitations recognized by both the treating and consultative physicians and previously acknowledged by the ALJ in calculating her RFC did not lead to an "additional loss of work capacity beyond a negligible one." Zabala, 595 F.3d at 410; see also Scott v. Colvin, No. 15-CV-8785 (AJP), 2016 WL 3919662, at *10 (S.D.N.Y. July 18, 2016) ("In relying upon the Grids . . . [the] ALJ was obligated to explain her finding that [claimant's] nonexertional limitations had only a negligible impact on the range of work permitted by her exertional limitations."); Kessler v. Colvin, No. 14-CV-8201 (JPO), 2015 WL 6473011, at *7 (S.D.N.Y. Oct. 27, 2015) (remanding case where ALJ relied on Grids and concluded that claimant was capable of performing "simple, unskilled tasks . . . and interact[ing] with co-workers" without vocational testimony).

Indeed, the ALJ's own calculation of Henny's RFC properly recognized her additional, nonexertional limitations, noting that she was "limited to understanding and carrying out simple, routine repetitive work" due to her mental impairments. The incorporation of these restrictions into her RFC indicates that they have a more than "negligible" effect on the occupational base of unskilled light work, and necessitate vocational expert testimony.

Accordingly, because the ALJ failed to explain why Henny's nonexertional limitations had only a negligible impact on the range of work available, reliance on the Grid was improper, and this case is remanded for vocational expert testimony.

## CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's motion for

judgment on the pleadings be DENIED. The Court recommends REMAND for vocational expert

testimony and a proper calculation of Henny's RFC addressing the physical restrictions in Dr.

Lathan's consultative examination.

SARAH NETBURN
United States Magistrate Judge

DATED:     March 15, 2017
           New York, New York

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation

to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules

of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service

is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's

objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such

objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the

chambers of the Honorable Gregory H. Woods at the United States Courthouse, 500 Pearl Street,

New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be

addressed to Judge Woods. The failure to file these timely objections will result in a waiver of

those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

cc:        Ashley Y. Henny (*By Chambers*)
           174 W. Ramapo Road, Apt. D
           Garnerville, NY 10925